# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| United States of America *ex rel.* AUDREY A. KLIMAWICZE, | ) ) ) |
| Petitioner, | ) ) |
| vs. | ) Case No. 06 C 2941 ) |
| MARY SIGLER, Warden, Dwight Correctional Center, | ) ) ) ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In 2000, an Illinois jury convicted Audrey A. Klimawicze ("Klimawicze") on charges of first degree murder, armed robbery, and home invasion. The trial judge sentenced Klimawicze to ninety-two years imprisonment on the murder charge and concurrent thirty-year terms on the armed robbery and home invasion charges. Klimawicze has petitioned the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. She alleges that her Sixth Amendment right to confront the witnesses against her was violated by the introduction of statements made by her co-defendant, Hector Mercado, while both she and Mercado were in police custody. For the following reasons, the Court denies Klimawicze's petition.

### Background

On August 2, 1997, Chicago police found the partially burned body of Klimawicze's mother, Audrey V. Klimawicze ("Mrs. Klimawicze"), in a garbage container located in an alley near her home on the south side of Chicago. Mrs. Klimawicze had been stabbed and strangled. Later the same day, the police arrested Klimawicze and Mercado.

Klimawicze and Mercado were tried simultaneously, before separate juries.

Klimawicze's sole claim in her habeas corpus petition concerns what she contends was the improper admission of statements made by Mercado to the police while both she and Mercado were in custody.

The Court takes the following description of Klimawicze's interrogation by the police from the Illinois Appellate Court's decision affirming her conviction:

> The Chicago police found the partially burned body of Audrey V. Klimawicze on August 2, 1997, in a garbage container located in the alley of the 3300 block of South Emerald Avenue. The victim had been stabbed and strangled. At 7:05 that evening, the police arrested defendant, who was the victim's daughter, and codefendant Hector Mercado.
>
> Police questioned both defendant and codefendant Mercado at 9:30 p.m. on August 2, 1997, and they denied any knowledge of the crime. At 10 p.m., an eyewitness identified Mercado in a lineup as the man she saw pushing the garbage cart down the alley the previous evening. At 12:30 a.m. on August 3, 1997, police told Mercado he had been identified in the lineup. Mercado told police that defendant told him she had a fight with her mother and that she had stabbed her. Defendant and a man named Mario placed the victim in a garbage can behind her apartment building. Mercado admitted he later moved the can further down the alley.
>
> At 4 a.m. on August 3, 1997, taxi driver Joe Martinez told police he drove defendant and Mercado on August 2, 1997. [Martinez said that] [d]efendant told [him] she had an argument with her mother and had stabbed her. According to Martinez, defendant said, "The bitch deserved it," and Mercado replied, "You're right. She deserved it. They can't prove a thing."
>
> At 4:30 a.m., police advised defendant of her Miranda rights and confronted her with Mercado's and Martinez's statements. She told police she had an argument with her mother and that her mother pulled a knife on her. Defendant was able to take the knife away. When she told Mercado what happened, he took the knife, went to the victim's apartment, and stabbed her. According to defendant, Mercado placed her mother's body in the garbage container. Defendant gave the same version of the story when interviewed by police three hours later.
>
> At 8:30 a.m., Mercado repeated his 12:30 a.m. statement. The police again confronted defendant with Mercado's and Martinez's statements. She gave the same statement as earlier and agreed to repeat her statement to Mercado.
>
> After listening to defendant, Mercado told police defendant had talked about killing her mother for three weeks. At 10:30 p.m. on July 31, 1997, defendant asked Mercado to accompany her to her mother's apartment so they could kill her. Mercado told police he refused but went down to the second floor apartment when he heard a loud noise. He saw defendant stab her mother with a large

2

knife several times. Over the next 20 hours, he used money defendant found in the victim's apartment to buy heroin. On August 1, 1997, he placed the victim in the garbage container and later pushed it down the alley.

Police then confronted defendant with Mercado's latest statement. Defendant repeated her earlier statements. At 4 p.m. defendant initiated a conversation with police. She reiterated her earlier statement but added Mercado did not return to their apartment on the night of August 1, 1997. On the morning of August 2, 1997, Mercado told defendant he had burned the garbage cart and police were investigating.

At 7:30 p.m. on August 3, 1997, defendant, after being informed of her rights, gave the same statement to assistant State's Attorney Thomas Bilyk.

An hour later, Mercado gave Bilyk a different story. He said defendant told him she was going "to do" her mother. Defendant returned because her mother would not let her enter the apartment. Defendant then took a long black cord and Mercado took a hunting knife to the victim's apartment. Defendant kicked her mother and forced her way into the apartment. Mercado followed. Defendant then strangled the victim with the cord and instructed Mercado to stab her. He stabbed the victim three times while defendant continued to choke her. After taking money from the victim's apartment, they went to the projects to buy heroin and dispose of their weapons. The next day, Mercado placed the victim and a carpet into a garbage container from the alley. Later, they moved the container to the alley and set it on fire. He also said defendant told the cabdriver named Joe that she killed her mother.

At 9:15 p.m., defendant was confronted with Mercado's 8:30 p.m. statement. She expressed disbelief that Mercado made the statement; the police brought him into defendant's interview room. He told defendant, "I told them the truth." Police escorted him from the room, and Bilyk informed defendant of her rights. She agreed to give a handwritten statement, which was later admitted at trial.

*People v. Klimawicze*, 352 Ill. App. 3d 13, 16-18, 815 N.E.2d 760, 765-67 (2004) ("*Klimawicze II*").

At trial, the prosecution introduced Klimawicze's written statement. The Court takes the following summary of the statement from the appellate court's initial decision in her appeal:[1]

In the statement, defendant said she had trouble in her relationship with her mother about 60 percent of the time. On the night of July 31, 1997, defendant

---

[1] In its initial decision, the appellate court concluded that Klimawicze had been arrested without probable cause and remanded the case to the trial court for further proceedings to determine whether her confession was sufficiently attenuated from the illegal arrest to allow it to be admitted in evidence.

3

> was upset and felt like killing her mother. She told Mercado she wanted to "choke the shit out of her." Mercado handed her a cord and told her to "do it the right way." She put a cord in her pocket, and Mercado put a knife in his pocket. They went downstairs to her mother's apartment. Defendant knocked on the door and convinced her mother to allow them inside. They entered, and Mercado closed and locked the door. Defendant came up behind her mother and pulled the cord tight around her mother's neck. Mercado stabbed the victim. When defendant released the cord, the victim fell to the floor. Defendant took money from a dresser drawer and left. The next day, she returned to the apartment and took more money. Defendant and Mercado then put the body in a garbage can and carried it down the back stairs. The next day he told defendant he had burned the can with lighter fluid. That day, defendants took a cab to a building, where they bought drugs. Defendant told the cab driver she had stabbed her mother and said she would be in real trouble if she did not finish what she started.

*People v. Klimawicze*, No. 1-00-3531, slip op. at 6-7 (Ill. App. Mar. 12, 2003) ("*Klimawicze I*").

The prosecution introduced other evidence in addition to Klimawicze's confession. Joe Martinez, a cab driver who had driven Klimawicze and Mercado shortly after the murder, testified that Klimawicze told him she had killed her mother. Dr. Joseph Cogan, an assistant medical examiner, testified that the victim died as a result of strangulation and six stab wounds. Based on Dr. Cogan's testimony, the prosecution argued that the murder had to have been committed by at least two people.

Klimawicze's defense was consistent with her initial statements to the police, in which she had denied killing her mother. Klimawicze testified in her own defense and stated that she had caught Mercado killing her mother and that he threatened to harm her and her child if she did not keep quiet. She testified that the handwritten confession she had signed was drafted by the assistant state's attorney present during the questioning and that it was false; she claimed she had signed it as a result of fatigue, isolation, confinement, and relentless police tactics.

Two witnesses for the prosecution, a police detective and a prosecutor, testified regarding the events leading up to Klimawicze's signing of the confession. They testified that Klimawicze changed her story and agreed to provide a written confession only after Mercado told her that he had told police the "whole story." Specifically, detective Joseph Danzl, one of

4

the police officers who investigated the crime, testified as follows:

    Q:    Can you tell me after you heard the knocking [at the door] what you did?

    A:    I went to the door to see what she wanted.

    Q:    What happened then?

    A:    She told me she wanted to tell me the whole story.

    Q:    Did you then speak to her again?

    A:    Yes, I did.

. . .

    Q:    What did she say to you and what did you say to her?

    A:    She told me basically the same story that she told at 7:30 in the morning, and then she also said that she went to bed around midnight on the night of the 1st of August, and she went to bed alone, and that Hector woke her up at about 6:15 in the morning, and this would be August 2 – Saturday, August 2, and Hector told her that he had burned the garbage cart, and the police were in the alley.

. . .

    Q:    And did that conversation end at that point?

    A:    Yes.

    Q:    Did you ever have another conversation with Audrey Klimawicze?

    A:    Yes, I did.

    Q:    About what time is this conversation?

    A:    It was about 9:15 on the night of August 3.

. . .

    Q:    Can you tell me who was present for that conversation?

    A:    Myself, Detective McGuire, and assistant state's attorney Bilyk.

. . .

    Q:    What did you do at that time?

> A: Detective McGuire left the room, and he brought Hector Mercado to the doorway and into the room, and Hector Mercado made a statement to Audrey Klimawicze.
>
> Q: What did he say?
>
> A: He told her that he had just told the assistant state's attorney and the detective the true story.
>
> Q: And then what happened?
>
> A: Detective McGuire took Hector Mercado out of the room and put him in another room and then he returned to the room.
>
> Q: What happened at that time?
>
> A: Assistant state's attorney Bilyk informed Audrey Klimawicze of her Constitutional rights.
>
> Q: After he did that, did you have a conversation with her?
>
> A: Yes.
>
> Q: About how long did that conversation last?
>
> A: About 45 minutes.
>
> Q: What happened at the conclusion of that conversation?
>
> A: Detective McGuire left the room and then assistant state's attorney Bilyk explained to Audrey Klimawicze the type of documentation for her statement, whether it be oral, handwritten, or court-reported.
>
> Q: Did Audrey make a choice?
>
> A: She did.
>
> Q: What did she choose?
>
> A: She decided on a handwritten statement.

Trial Tr. K67-70.

Assistant state's attorney Thomas Bilyk also testified regarding what Mercado said to Klimawicze:

> Q: After interviewing Hector Mercado and Joe Martinez, what did you do?

A: I went back and interviewed the defendant.

Q: And that would be Audrey A. Klimawicze again?

A: Yes.

Q: Did you go back to the same room?

A: Yes, I did.

Q: Who was with you at that time?

A: At that time, myself, Detective Danzl, and Detective McGuire.

. . .

Q: And what did you say to her and what did she say to you?

A: I went in. I sat down and I looked at her, and I said Hector told us the whole story.

. . .

Q: What else did you say?

A: I said a few other things and then I said are you ready to tell the truth?

Q: Did she respond?

A: She said that she did not believe that Hector said that.

Q: What did you say then?

A: I asked her if she wanted to hear from Hector himself.

Q: What did she say?

A: She said yes.

Q: What happened then?

A: One of the detectives got up and brought Hector into the room.

. . .

Q: What happened then?

. . .

7

> A: Hector said I told them the true story.
>
> Q: What happened after that?
>
> A: She looked away. Hector left the room.
>
> Q: Did you have any further conversation with Audrey A. Klimawicze after Hector came in and said I told them the true story?
>
> A: Yes, I did.
>
> Q: And how long did that conversation last?
>
> A: Approximately 45 minutes.
>
> Q: At the conclusion of that 45 minute interview, can you tell us what happened?
>
> A: I asked her if that was the whole truth and she –
>
> Q: What was her response?
>
> A: She said yes.
>
> Q: And then what happened?
>
> A: I said if that was the truth, did she wish to memorialize it in written form and she said, yes.

Trial Tr. K151-54.

The prosecution used this testimony during closing argument to rebut Klimawicze's contention that her written confession had been coerced. The prosecutor said,

> and then later, the coup de gras [sic], when Assistant State's Attorney Bilyk came and ASA Bilyk said to her Hector told us the true story, Audrey said I don't believe it. And he said would you like to hear from Hector. What is so deceitful about that, what is improper about that? That is absolutely completely proper. State and police interview or interrogation techniques of a murder suspect. If they can't do that, how are they going to do their job?
>
> DEFENSE COUNSEL: Objection.
>
> THE COURT: The objection will be sustained.
>
> PROSECUTOR: When Hector was brought into the room, and Hector said to Audrey, I told them the true story. That's when she knew the jig was up. That's when she gives the complete and true confession to the murder of her mother.

8

> How do you know this is true? Ladies and gentlemen, look at the evidence and the facts. First of all, all those shifts in her statements to the police and all those shifts she took when she testified on the witness stand as I said are the shifts made by a guilty mind.

Trial Tr. M84-85.

The juries separately convicted Klimawicze and Mercado of first degree murder, home invasion, and armed robbery. On appeal, the appellate court held that Klimawicze had been arrested without probable cause, and it remanded the case to the trial court to determine whether her confession was sufficiently attenuated from her arrest to be admissible. *Klimawicze I*, slip op. at 11-12. On remand, the trial judge found the confession admissible, and the case returned to the appellate court, which affirmed Klimawicze's conviction and sentence. *Klimawicze II*, 352 Ill. App. 3d at 16, 815 N.E.2d at 765. In January 2005, the Illinois Supreme Court denied her petition for leave to appeal, and in May 2005, the United States Supreme Court denied her petition for a writ of certiorari.

In *Klimawicze II*, Justice Warren Wolfson, writing for the appellate court, concluded that the admission of Mercado's statement did not violate the Confrontation Clause. The court relied largely on *People v. Fauntleroy*, 224 Ill. App. 3d 140, 586 N.E.2d 292 (1992). In *Fauntleroy*, two defendants were tried together for murder and robbery. The assistant state's attorney testified that, while the defendants were in custody, Fauntleroy had been shown a statement signed by his co-defendant and the co-defendant had told him "tell the truth – I did." *Id.* at 145, 586 N.E.2d at 295. Fauntleroy argued that the assistant state's attorney's testimony violated his Sixth Amendment right to confront witnesses. The appellate court rejected this contention, holding that the statement "was offered for the non-hearsay purpose of showing the jury the circumstances surrounding [the defendant's confession] and the effect [the co-defendant's] presence and his 'truth' remark had on [the defendant]." *Id.* at 147, 586 N.E.2d at 296.

The appellate court held in Klimawicze's case that the references to Mercado's

9

statement were admissible, and their admission did not violate the Confrontation Clause, for the same reason discussed in *Fauntleroy*: "the prosecution was explaining why defendant decided to confess, thereby bolstering the reliability of her confession." *Klimawicze*, 352 Ill. App. 3d at 25, 815 N.E.2d at 772.

## Discussion

A district court may grant a writ of habeas corpus only if the state court's adjudication of petitioner's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Klimawicze's sole argument in her petition for habeas corpus is that the admission of the references to Mercado's statement to the police violated her rights under the Sixth Amendment's Confrontation Clause and that the appellate court's decision was contrary to, or unreasonably applied, the Supreme Court's decisions in *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny, and *Crawford v. Washington*, 541 U.S. 36 (2004). The Supreme Court did not decide *Crawford* until after Klimawicze's trial. But because the Court decided the case while her direct appeal was pending, *Crawford* applies to Klimawicze's case. *See Schriro v. Summerlin*, 542 U.S. 358, 351 (2004) (when a Supreme Court decision announces a new rule of constitutional criminal procedure, that rule applies to all criminal cases still pending on direct review).

### 1. *Bruton* and its progeny

In *Bruton*, two defendants, Evans and Bruton, were tried jointly for armed robbery. The prosecution introduced evidence that Evans had confessed that he and Bruton committed the crime. The trial judge instructed the jury that Evans' confession could be considered against Evans but not against Bruton. The Supreme Court ruled that the introduction of Evans' confession violated Bruton's right to confront the witnesses against him, despite the limiting instruction to the jury; it overruled prior precedent holding that the infringement of the

defendant's confrontation right could be avoided by giving a limiting instruction. The Court concluded that the usual presumption that a jury will follow the trial judge's instructions did not carry the day. It said that

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, is deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect . . . .

*Id.* at 135-36 (citations omitted). In overturning Bruton's conviction, the Court "emphasize[d] that the hearsay statement inculpating [Bruton] was clearly inadmissible against him under traditional rules if evidence, the problem arising only because the statement was . . . admissible against the declarant Evans." *Id.* at 128 n.3 (citations omitted). It stated that "[t]here is not before us . . . any recognized exception to the hearsay rule insofar as [Bruton] is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause." *Id.*

In *Richardson v. Marsh*, 481 U.S. 200 (1987), the Court held that a defendant's Confrontation Clause rights are not violated when a non-testifying co-defendant's confession is admitted with an appropriate limiting instruction not to consider it against the defendant, if "the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211. In *Richardson*, the co-defendant's confession omitted any indication that anyone other than the co-defendant and a third person had participated in the crime. *Id.* at 203. The Court distinguished the co-defendant's confession in *Bruton* as a confession that was "incriminating on its face" and that had "expressly implicat[ed]" Bruton. *Id.* at 208. Later, in *Gray v. Maryland*, 523 U.S. 185 (1998), the Court ruled that redactions from a non-testifying co-defendant's confession that simply replace the defendant's name with a blank space or the term

11

"deleted" fell within the category of statements to which *Bruton*'s prohibition applies.  The Court noted that *Richardson* "placed outside the scope of *Bruton*'s rule those statements that incriminate inferentially."  *Id.* at 195 (citing *Richardson*, 481 U.S. at 208).  But it said that the sort of inference considered acceptable in *Richardson* "involved statements that did not refer directly to the defendant himself and which became incriminating 'only when linked with evidence introduced later at trial.'"  *Id.* at 196 (quoting *Richardson*, 481 U.S. at 208).  The statement introduced in *Gray* was one that, "despite redaction, obviously refer[red] directly to someone, often obviously the defendant, and which involve[d] inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial. Moreover, the redacted confession with the blank prominent on its face, in *Richardson*'s words, '*facially* incriminat[es]' the codefendant."  *Id.* (emphasis original in *Gray*) (quoting *Richardson*, 481 U.S. at 209).

In *Klimawicze II*, the appellate court concluded that the admission of the references to Mercado's statement did not violate *Bruton*.  The court determined that Klimawicze's case differed from *Bruton* because her trial was severed from that of Mercado, and the substance of Mercado's statement was not admitted during Klimawicze's trial.  *Klimawicze II*, 352 Ill. App. 3d at 24, 815 N.E.2d at 772.  In so ruling, the appellate court did not contravene *Bruton* or its progeny, nor did it unreasonably apply those decisions.  First, it is open to question whether the *Bruton* rubric applies outside the joint-trial context.  The Seventh Circuit has indicated that *Bruton* and its progeny concern cases in which the confession of one defendant is offered at a *joint* trial.  *See United States v. Jones*, 371 F.3d 363, 368 (7th Cir. 2004).  That is not what occurred here.  One of the common remedies for a potential *Bruton* problem – which arises when one defendant has given a statement inculpating the other – is to order separate trials.

That is what the trial court did here.[2] The prosecution did not seek, as it might have in pre-*Bruton* days, to conduct a single jury trial of both defendants in which each defendant's statement would be offered in full against the defendant making the statement, with an instruction barring its consideration against the other defendant. In short, unlike *Bruton*, this case does not involve the admission against a defendant of a jointly tried co-defendant's statement that is concededly hearsay. Rather, it involves admission of the fact (and arguably part of the contents) of a statement by a separately tried co-defendant, for what is claimed to be a proper, non-hearsay purpose.

This case differs from *Bruton* and its progeny in another significant way: as the Illinois Appellate Court determined, the substance of Mercado's statement was not introduced against Klimawicze. Rather, all that was introduced regarding the statement was testimony that, during the interrogation of Klimawicze, assistant state's attorney Bilyk told her that Mercado "told us the whole story" and that Mercado was then brought into the room and told Klimawicze the same thing – that he had told the police "the true story." In other words, in contrast to the cases in the *Bruton* line, the contents of the non-testifying co-defendant's statement were not introduced. More specifically, the jury was not told that Mercado had implicated Klimawicze in the murder. Nor did the prosecution say or suggest that Klimawicze's confession was consistent with what Mercado had said – which would have put the contents of Mercado's statement directly before the jury.

To be sure, a jury might well have inferred from the chain of events that Mercado had implicated Klimawicze in his statement to the police. But under *Richardson*, statements of a non-testifying co-defendant that implicate the defendant only inferentially – the most that can be

---

[2] More specifically, the trial court held separate but simultaneous trials before separate juries, each of which was excused when evidence admissible only against the other defendant was being offered, and during the opening statements and closing arguments pertaining to the other defendant.

13

said in this case – do not run afoul of *Bruton*. Such is the case with the references to Mercado's out-of-court statement that the prosecution introduced at Klimawicze's trial. In short, the fact that a jury might have put two and two together after hearing the references to Mercado and then hearing Klimawicze's confession, in which she admitted to killing her mother along with Mercado, does not give rise to a *Bruton*-type Confrontation Clause problem. For this reason, the Illinois Appellate Court did not decide Klimawicze's case in a way that was contrary to, or involved an unreasonable application of, *Bruton* or its progeny. *See Mason v. Yarborough*, 447 F.3d 693, 695-96 (9th Cir. 2006) (reference to fact that co-defendant made a statement, without reference to its contents, does not implicate *Bruton*).

**2.    *Crawford***

The fact that no *Bruton*-esque Confrontation Clause violation occurred does not end the Court's consideration of the case. Klimawicze also argues that the state court's decision is contrary to, or an unreasonable application of, *Crawford v. Washington*. The appellate court did not specifically discuss *Crawford* in its discussion of the admission of the references to Mercado's statement. But as the following discussion makes clear, its analysis was entirely consistent with *Crawford* and did not run afoul of the rule the Supreme Court established in that case.

In *Crawford*, the Supreme Court held that a non-testifying declarant's "testimonial" hearsay statements cannot be introduced against a defendant in a criminal case. *Crawford*, 541 U.S. at 68. A statement made during a police interrogation is considered testimonial, at least if used to prove the truth of the matters asserted in the statement. *Id.* at 59 n.9 & 68. *Crawford* overruled *Ohio v. Roberts*, 448 U.S. 56 (1980), which allowed the admission of an unavailable witness's statement against a criminal defendant if the statement bore "adequate indicia of reliability." *Id.* at 66.

Neither *Crawford* nor the Confrontation Clause bars, however, the admission of an

14

absent declarant's out-of-court statement for some legitimate evidentiary purpose other than to prove its truth. In *Tennessee v. Street*, 471 U.S. 409 (1985), the Supreme Court considered a case in which the prosecution had introduced an absent co-defendant's written statement – the statement itself, not oblique and indirect references like those made at Klimawicze's trial – to rebut Street's contention that the police had coerced him to confess. Street argued that the police had read the co-defendant's statement to him and then pressured him to adopt its contents. To rebut this argument, the prosecution offered the co-defendant's statement to show how it differed from Street's own statement. *Id.* at 411-12. In approving the admission of the co-defendant's statement, the Court distinguished earlier decisions finding a Confrontation Clause violation when an out-of-court statement was offered as substantive evidence against a defendant – in other words, for the truth of the statement's contents. It ruled that the prosecution's use of the co-defendant's statement against Street did not amount to hearsay and thus did not violate the Confrontation Clause: "[t]he nonhearsay aspect of [the co-defendant's] confession – not to prove what happened at the murder scene but to prove what happened when [Street] confessed – raises no Confrontation Clause concerns." *Id.* at 414.

In *Crawford*, the Supreme Court specifically affirmed *Street* in this regard. The Court stated that "[t]he [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. *See Tennessee v. Street*, 471 U.S. 409, 414 (1985)." *Crawford*, 541 U.S. at 59 n.9. As the Seventh Circuit has recently reaffirmed, "[w]hen out-of-court statements are not offered to prove the truth of the matter asserted, the Confrontation Clause is satisfied if the defendant had the opportunity to cross-examine the person repeating the out-of-court statement." *United States v. James*, 487 F.3d 518, 525 (7th Cir. 2007). In Klimawicze's case, she had the opportunity to cross-examine detective Danzl and assistant state's attorney Bilyk, through whom the prosecution introduced the contents of Mercado's statement.

In *Street*, unlike in Klimawicze's case, the jury was given a limiting instruction that it could not consider the truthfulness of the co-defendant's statement. *Street*, 471 U.S. at 414-15. The Court stated that "[i]f the jury had been asked to infer that [the co-defendant's] confession proved that [Street] participated in the murder, then the evidence would have been hearsay." That danger was eliminated, however, by the limiting instruction, which the Court presumed the jury had followed. *Id.*

The jury in Klimawicze's case was not given a limiting instruction regarding its use of the reference to Mercado's statement. But that omission does not, in the Court's view, lead to a result in this case different from the ruling in *Street*. Assuming, for purposes of discussion, that the limiting instruction was critical to the outcome in *Street*, the difference between that case and this one lies in what exactly was introduced in evidence. In *Street*, the prosecution introduced – albeit for a nonhearsay purpose – the *entirety* of the co-defendant's written statement, which directly implicated Street himself.[3] In the present case, by contrast, *none* of the contents of Mercado's statement were introduced; rather, the witnesses related only that Klimawicze was told that Mercado had told "the whole story" or "the truth story." In addition, though the prosecutor made reference to this episode in her closing argument, she did not discuss the contents of Mercado's statement but rather argued the point consistent with the purpose for which the Mercado evidence had been offered – to show the circumstances under which Klimawicze had confessed, to refute her claim of undue pressure. Given this context, the absence of a limiting instruction – which Klimawicze's counsel does not appear to have

---

[3] As recounted in the state court decision reviewed by the Supreme Court in *Street*, the confession of Peele, Street's co-defendant, "made [Street] much more a principal actor in the burglary and hanging than [Street's] September 17th confession did. In his confession [Street] said that he kept telling Peele to leave after they had robbed [the victim] but that Peele insisted on the hanging; that [Street] did not actually participate in the hanging. Peele's confession said that both he and [Street] placed the rope around [the victim's] neck." *State v. Street*, 674 S.W.2d 741, 746 (Tenn. App. 1984).

16

requested in any event, *see* Trial Tr. J145-55 – does not affect the Confrontation Clause analysis.

The appellate court did not make a *Crawford* analysis, presumably because it found that the references to Mercado's statement did not amount to hearsay. That was fully consistent with *Crawford* – specifically with its reference to and reaffirmation of *Street*. "When out-of-court statements are not offered to prove the truth of the matter asserted, the Confrontation Clause is satisfied if the defendant had the opportunity to cross-examine the person repeating the out-of-court statement." *United States v. James*, 487 F.3d 518, 525 (7th Cir. 2005) (citing *Street*, 471 U.S. at 414)).

For these reasons, the appellate court's decision was neither contrary to nor an unreasonable application of *Crawford*.

**3.     Harmless error**

Even had this Court concluded that the appellate court's decision was contrary to or an unreasonable application of *Crawford* or of *Bruton* and its progeny, any such error was harmless. In a case like this one, a state court's error entitles the defendant to a writ of habeas corpus only if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *see Fry v. Pliler*, 127 S. Ct. 2321 (2007) (*Brecht* harmless error standard applies in section 2254 proceedings). The references to Mercado's statement were oblique and did not communicate any of the statement's contents – more specifically, the references did not communicate that Mercado had implicated Klimawicze. Though the trial court did not give the jury a limiting instruction regarding its use of what Mercado was claimed to have said, the references to Mercado did not play a significant part in the prosecution's case against Klimawicze. These references were introduced only in the context of testimony describing the circumstances of Klimawicze's confession, and the prosecutor discussed these references in closing argument only in that context. This is not a

17

case in which the prosecution relied heavily on a hearsay statement to prove the defendant's guilt. *Compare Crawford*, 541 U.S. at 67 (prosecutor referred to statement as "'damning evidence'" that "'completely refutes [petitioner's] claim of self-defense.'") (citation to trial transcript omitted).

Klimawicze claimed at trial that her confession was coerced and thus was unreliable. She argues that Mercado's statement had the effect of swaying the jury in that regard. This misses the point; that is a non-hearsay use of Mercado's statement that *Crawford* does not prohibit.

In any event, though Klimawicze's confession was the primary evidence against her, the prosecution did introduce other evidence. Joe Martinez, a cab driver who drove Klimawicze and Mercado shortly after the murder, testified that Klimawicze told him that she had killed her mother. The medical examiner testified that the victim died of strangulation and stab wounds, therefore both injuries occurred while she was still alive. The prosecutor argued that Klimawicze and Mercado both committed the murder because it would be impossible for one person to strangle and stab the victim essentially simultaneously. Klimawicze testified that she did not go to police after Mercado killed her mother because Mercado had beaten her and left bruises only days prior; she feared that he would hurt her and her daughter if she went to police. Witnesses testified, however, that she had no bruises around the time of the murder, and pictures taken at the jail hospital showed no such injuries. Nor did jail medical records suggest that Klimawicze had bruises. Finally, the prosecution introduced evidence of Klimawicze's frequently shifting story to police even before being confronted with Mercado's statement. The prosecutor argued that Klimawicze's changing story was further evidence of her guilt.

For these reasons, even if the admission of the references to Mercado having given "the full story" or "the true story" violated Klimawicze's Confrontation Clause rights, this did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507

U.S. at 623. Any such error was therefore harmless.

## Conclusion

For the reasons stated above, the Court denies Klimawicze's petition for a writ of habeas corpus. The Clerk is directed to enter judgment in favor of the respondent. On the Court's motion, a certificate of appealability is issued pursuant 28 U.S.C. § 2253(c).

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 15, 2008